UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ESSEX,

      Plaintiff,

      v.

PIERCE, et al.,

      Defendants.

No. 10 C 6785
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Andre Essex seeks habeas corpus relief from a sixty-year sentence for first-degree murder of his ex-girlfriend. The offense occurred 18 September 2001. He was sentenced in early 2005.

The facts are set forth in the affirmance of the Appellate Court.

[Essex] began dating Judith Namugwe in 2000. However, problems developed in the relationship. In August 2001, [Essex] called Judith's aunt, Jennifer Kakooza, and told her that he was "angry that Judith was quitting the relationship." [Essex] indicated to Jennifer that he knew Judith was having another relationship, and that it made him angry and upset. [He] also wrote two letters to Judith that expressed these sentiments. On September 18, 2001, the night of the murder, at approximately 9 p.m., Judith entered her apartment building, Judith took the service elevator to her apartment. Also riding in the service elevator were building maintenance man Enes Lukovac and his wife. Lukovac testified that he pressed the 4th floor button so he could fix a passenger elevator on that floor and that he pressed the 6th floor button for his wife. He stated that Judith pushed the 12th floor button. Lukovac testified that he got out at the 4th floor but did not find the passenger elevator to fix. He then began taking the stairs to locate the passenger elevator. At the 8th or 9th floor, Lukovac heard a "very,

1

very heavy screaming" coming from a woman on the floor above him. Lukovac took the freight elevator up to the 12th floor where he observed Judith's body lying on the hallway floor. Lukovac went to the passenger elevator and found a piece of black plastic jammed in the elevator door to keep it open. Chicago Police Department Forensic Investigator Joseph Dunigan testified that he discovered Judith's body lying on the 12thfloor face-down. Judith had three knife wounds in her left chest. A steak knife was discovered in the stairwell on the seventh stair up from the 4th floor. The blade of the knife was bent in a U-shape and covered in blood. The blood was later determined to be Judith's. On September 19, 2001, [Essex] called Jennifer's house and left a message, stating, "Hello, Jennifer, this is Andre. Tell Judith I'm so sorry for what I did to her. But there was a lot of deception on her part. And I just don't know what happened. So she doesn't have to worry about me coming around her anymore. I'm not even gonna be here." Shortly after leaving the message, [petitioner] attempted suicide. He was admitted to the Intensive Care Unit of Provident Hospital. While there, he was given sedatives. Dr. Akbar Khan testified that the sedatives would have had no [effect] on[Essex's] mental capacity. On September 22, 2001, [Essex] spoke with the police while at the hospital after being advised of his *Miranda* rights. [Essex] informed the police that on September 18, the day of Judith's death, he left Judith's apartment and went to McDonald's at noon. He said that he went to the library afterward. According to [him] he returned to Judith's apartment building that evening. He said he met Judith in the lobby and the two of them went up to her apartment. On September 23, 2001, [Essex] again spoke with the police after being advised of his *Miranda* rights. [Essex] said he and Judith got into an argument on the night of her death. He said he left the building and went to the apartment of his friend Musu Faye. According to Detective Greg Pittatsis, [Essex] said his friend's apartment was located in the 5100 block of North Kenmore Avenue. Detective Pittatsis testified that he was unable to locate Musu Faye. At the close of the State's case, defense counsel made a motion for a directed finding which the trial court denied. [Essex] did not testify and did not call any witnesses. The jury found [him] guilty of first degree murder. He was sentenced to a term of 60 years in the Illinois Department of Corrections.

On appeal Petitioner argued that the trial court erred in refusing to order a new fitness evaluation after hearing that Essex was no longer taking his prescribed medication. Both prosecution and defense moved for a new psychological evaluation of Essex. He challenged his *in absentia* sentencing; while he voluntarily (and insistently) absented himself from the hearing, he complains that he was not warned that the court could and would sentence him if he left the courtroom. There were arguments on appeal that the trial court did not properly deal with certain *pro se* claims of ineffective assistance of counsel and that prosecutor committed many errors in presenting its case.

After affirmance, Essex filed an unsuccessful petition for leave to appeal in Illinois Supreme Court. The petition for leave to appeal was denied in September 2007, and in March, 2008 he filed a *pro se* post-conviction petition with a large number of grounds.

This petition claimed denial of speedy trial because his lawyer requested continuances to await DNA test results and to determine whether to object to DNA evidence which issue appellate counsel failed to raise on appeal. Essex also alleged that his lawyer coerced him to plead guilty to a separate charge of battery. Ineffective assistance of counsel was claimed for a long list of other acts of his defense lawyer, to wit, (a) failing to tell Essex that his handwritten letters to the

victim were admissible, (b) stipulating to the letters' contents, (c) failing to argue

to the jury that the police report did not mention an open window in the stairwell of

the 12th floor of the victim's apartment building, (d) failing to object to the

admission of a photograph of the 12th floor hallway, (e) failing to cross examine

Kakooza about her telephone conversation with Essex in light of Essex' claim that

Kakooza perjured herself in recounting the conversation, (f) failing to object to the

prosecutor's erroneous argument that Essex did not know where the victim was

two days before the murder, (g) failing to object to the prosecution closing

argument, and (h) failed to deal properly with the fingerprint evidence. This last

point also included a claim that appellate counsel failed to raise it on appeal. There

were two claims against the prosecution; one that it argued facts not in evidence

and the other that it prejudiced Essex with the letters he wrote to the victim.

This kitchen-sink pleading raising a host of ordinary trial errors was

dismissed in April 2008 as frivolous; some of the claims were deemed forfeited.

Essex appealed but did not argue the merits of his claims, rather he simply attacked

the manner in which the post-conviction court handled them. It was an appeal on

procedural grounds and not on the merits. There is some irony in this appeal. The

Appellate Court agreed with Essex on his claim that some of the grounds should

not have been found forfeited. But Essex never argued in support of the merits of

his grounds. His sole demand was to have his case remanded for a second post-conviction hearing. The Appellate Court was quite willing to hear and decide the merits of some claims but Essex did not make those arguments nor did he appear to seek rehearing for that purpose in the Appellate Court.

What he did do was file another petition for leave to appeal and this time his sole grounds were the procedural failures of the post-conviction process and no argument on the merits issues.

After this end of the state court process, Essex filed (in October 2010) for the writ raising the refusal of the trial judge to order a new fitness evaluation, the lack of admonition about sentencing outside Petitioner's presence, the inadequate inquiry into claims of ineffective assistance of counsel and, finally, the failure of the post-conviction judge to consider the petition claims in a "meaningful manner."

About two and half months later, Essex sought leave to file another eleven grounds for the writ. I will list them as I address each one.

There are no remaining state remedies for any of his claims. Timeliness of the petition is not challenged.

Claims based on state law.

That a state court did not comply with state law (or, for that matter, ordinary federal law) is not a ground for granting the writ of habeas corpus. It is only

violations of the United States Constitution that can be a basis for issuing the writ. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). See also *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004).

The state post-conviction process and the Grand Jury jurisdiction are creatures of state law. Neither is required by the Constitution and the failure to follow state law is not a ground for the writ to issue. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (states are not constitutionally required to provide procedures for post-conviction relief). Even if the post-conviction court erred as the Appellate Court found there is no ground for this Court to grant the petition. The petitioner was indicted and given notice of the charges against him as the Constitution requires, whether the Grand Jury was or was not empowered to do so under state law is not a federal habeas corpus issue. I note that the only support for the claim of want of jurisdiction is hearsay which, if it does exist, bears no indicia of reliability.

Claims not preserved for federal review.

It is well understood and accepted that federal habeas review is possible, first, only if the petitioner has properly exhausted his available state court remedies and, in doing so, fully and fairly presented his claims in one complete round of state court review, "thus giving the state courts a decent opportunity to consider the

substance of the claims that he later challenges in District Court." *Harris v. McAdory*, 334 F.3d 665, 668 (7thCir. 2003); *see also O'Sullivan v. Boerckel*, 526 U.S. 848, 845 (1999).

Second, even when a petitioner does properly present a claim in state court, that claim will be denied in federal habeas proceedings if the state judiciary rejected it "on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730 (1991). Federal courts will not review a state court decision resting on state law grounds that are independent of the federal question and adequate to support the judgment. *Franklin v. Gilmore*,188 F.3d 877, 881 (7th Cir. 1999). A state court decision is "independent" of federal law when it does not depend upon a federal constitutional ruling on the merits. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002). A state court decision is "adequate" to bar federal habeas review when it rests upon firmly established and regularly followed state practice. In other words, a prisoner must obey the state law rules on the manner in which claims must be presented to the state courts in order to have "fully and fairly" presented his claim.

Where, as here, the "state court decides the merits *and* asserts a procedural bar, the federal court must respect both rulings." *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002)(emphasis in original).

Under these rules certain claims of the petitioner fail.

The protest over being sentenced when not present in court was resolved by the Appellate Court in the post-conviction appeal. The Court wrote:

> [Petitioner] contends that his rights to due process and a fair trial were violated when sentencing continued in his absence. The State maintains that [petitioner] waived his right to be present during sentencing and therefore, his rights were not violated. During [petitioner's] sentencing hearing, before the State's case in aggravation, [petitioner] indicated that he did not want to be in the courtroom. [Petitioner] stated: "I don't think that I should have to sit here and listen to that. I think this is just something to try to humiliate me and I don't appreciate it." When asked if he wanted to stay in the courtroom, [petitioner] responded, "I don't want to" and [petitioner] left the courtroom. Likewise, during mitigation, [petitioner] declined to return to the courtroom to address the court.
>
> [Petitioner] has failed to preserve his claim of error. Under the Unified Code of Corrections, a defendant's challenge to any aspect of a sentencing hearing must be made through a written motion filed within 30 days of the sentence. 730 ILCS 5/5-8-1(c) (West 2004) Failure to do so waives those issues for appeal. 730 ILCS 5/5-8-1(c) (West 2004); *People v. Reed*, 177 Ill.2d 389, 394 (1997). [Petitioner] did not preserve this claim in his motion to reconsider the sentence. Accordingly, he has waived this issue for review.

The Appellate Court's application of this independent and adequate state law ground bars federal habeas review. First, its application of the rule was independent of the underlying federal question. That is, the appellate court did not intertwine the underlying federal due process/fair trial issue with its enforcement of the waiver (actually a forfeiture) rule in Section 5-8-1(c) of the Code of Corrections. Indeed, the court did not even mention the federal claim

in its enforcement of the state procedural rule. Thus, its resolution of the claim rested independently on state law. Enforcement of this rule here was adequate because the rule is firmly-established and regularly-followed in state practice. *See Franklin*, 188 F.3d at 882. Prior to 1993, the statute provided only that a defendant "may" file a motion to reduce his sentence within thirty days after the sentence was imposed. *See* Ill.Rev.Stat.1991, ch. 38, para. 1005-8-1(c). In 1993, the statute was amended to require that a defendant "shall" file a written motion attacking "any aspect of the sentencing hearing" within thirty days of the imposition of sentence. *See* 730 ILCS 5/5-8-1(c). The Illinois Supreme Court subsequently interpreted the amendment "to require sentencing issues be raised in the trial court in order to preserve those issues for appellate review." *People v. Reed*, 686 N.E.2d 584, 586 (Ill.1997). This interpretation was consistent with the court's reading of the "nearly identical" language in 725 ILCS 5/116-1(b), requiring that a defendant preserve trial issues for appeal by including them in a written motion within thirty days after the entry of a verdict.

Thus, in disposing of petitioner's sentencing-in-absentia claim, the Appellate Court did not commingle its application of the pertinent state waiver rule with the substance of the underlying federal question. The absence at sentencing claim is procedurally defaulted "on independent and adequate state procedural

grounds." *Coleman*, 501 U.S. at 730.

Other claims are procedurally defaulted under a different theory. The rule requires a claim to be presented in one complete round of appellate review practice. What is means is that a defendant who raises an issue in the Appellate Court and loses must raise the same issue in a petition for leave to appeal. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). So too, if a post-conviction petition is filed, an appeal from denial must also raise the same issue all the way through petition for leave to appeal. A petitioner loses the right to seek federal habeas corpus if he or she drops the claim at one or another point in the process. 610 (7th Cir. 2009) (citing *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)).

Some claims were never raised in the state court. These are: the concealment of facts about the alibi witness, the defense counsel breaching the attorney client privilege with respect to his ingestion of narcotics and the judge's bias in working in concert with prosecutors to violate Essex' rights. There was a claim of numerous prosecutorial errors on the direct appeal but it was not repeated in the petition for leave to appeal.[1]

Some claims were arguably raised in the post-conviction petition but were

---

1 The errors are: prosecution arguing to the jury that Essex was a liar, that prosecutors fabricated evidence, suborned perjury, introduced privileged evidence, suppressed alibi witnesses and misrepresented the facts.

not raised on their merits in the appeal from the denial of that petition.[2] The Appellate Court disposition of specific claims was not challenged in the petition for leave to appeal. All that Essex wanted was a remand to the circuit court for a second hearing.

There is no reason to excuse default. Essex was clearly fixed on one goal and one only which was to get a second hearing on claims whose merits he wanted to have decided by the Circuit Court. He focused on a procedural remedy but that remedy depended on a ruling that state law required that remedy and the Appellate Court was quite clear that it did not. Again, even if it was wrong about that, it did not properly enforce state law; no federal constitutional right was violated.

## The Claim That Was Preserved

The petitioner did raise the issue of a denial of a new psychological evaluation of his fitness to stand trial through one complete round of state court proceedings, i.e. through direct appeal and petition for leave to appeal. On March

---

2 The claims are defense counsel aiding the prosecutors' subornation of perjury of Kakooza, and failing to procure phone records to impeach Kakooza, and violating attorney-client privilege by stipulating that letters were written by Essex and improperly providing prosecutors with a prejudicial photograph of the 12th floor of victim's residence building and, finally, not objecting to admission of a plastic bag that contained Essex' personal property and fingerprints. The claims included the same allegation recited in footnote 1, *supra*. The Appellate Court did address some of these claims (that it deemed not forfeit) and found them without merit. These matters were not raised in the petition for leave to appeal which addressed only procedural issues and not substantive merits.

20, 2003, prior to trial, the trial court granted counsel's oral motion for a fitness examination. After examining Petitioner on May 29, 2003, Dr. Dawna Gutzmann concluded that Petitioner was "fit to stand trial with medication," namely, Prozac and Tazodone (antidepressants). (She also concluded that Petitioner was sane when he stabbed Ms. Namugwe.)

Dr. Gutzmann examined Petitioner on October 28, 2003, and again found Essex was fit for trial with the same medications. On September 19, 2003, Dr. Sharon Coleman examined Petitioner and found that he was fit for trial.

The trial court conducted a fitness hearing in December 2003. Dr. Gutzmann testified that, in conducting her evaluation, Petitioner had discussed the status of his case, his mental condition, and physical health. He was able to explain courtroom proceedings and understood the various roles of each of the courtroom personnel. Petitioner was, she found, able to assist his counsel in his own defense. He suffered no side effects from his prescribed antidepressants. On this basis, Dr. Gutzmann concluded that Petitioner was fit to stand trial if he took his anti-depressant medications, but that there was a likelihood that he might become unfit if he stopped taking them. Based on this testimony, the judge found Petitioner fit to stand trial "with medication."

On January 5, 2005, the second day of trial, Petitioner told the trial court that

he was dissatisfied with his trial attorney's performance, and offered two examples of counsel's failure to impeach witnesses. Later that afternoon, Petitioner's counsel reported that Petitioner had told her he had not been taking his medication. The court inquired. The following exchange occurred:

> Counsel: I spoke to [petitioner] this afternoon based on my concern about some of his behavior today as to whether [petitioner] was still receiving and still taking his medication. At that time [petitioner] informed me that he had not been taking his medication. On October 29th, 2003 an evaluation was given and dated [sic] that [petitioner] was fit to stand trial. We did have a hearing as to that. On a date after that [petitioner] was found fit to stand trial. [Petitioner] has been able to communicate with me, ask questions, relate information and I have no basis to feel that he is unfit. And I do believe that he is fit to stand trial but I did need to raise the issue with the Court because of the history that was described throughout the trial and because he was found fit to stand trial with medication.

The Court: Well, if you recall earlier this morning [petitioner] made a statement to the Court, basically giving the Court his evaluation or analysis of the testimony that occurred yesterday and asking questions with regard to why certain people may or may not have been asked questions by his attorneys and appeared to have a grasp, and a very good grasp of what was going on and the reason why certain questions may or may not have been asked. So I see no [bona fide] doubt with regard to the [petitioner's] fitness. If you don't have any doubt the Court - - the trial will proceed as fashioned. If you wish to do any other investigation with regard to the [petitioner's] stay in the jail, if anything else comes to the attention of you or whatever, you can certainly bring it to my attention and I will evaluate it. But I see no reason to doubt that the [petitioner] is anything but fit to stand trial at the present time.

Counsel: We concur.

Later the same day, the prosecution requested that Petitioner be evaluated for

fitness, and the following exchange occurred:

> Prosecutor: Judge, I didn't know if we had, you had decided as to the issue we had discussed previously, the fitness issue?
>
> The Court: I already did make a decision on that. Did you want to revisit that or say anything else about that?
>
> Prosecutor: Judge, I was asking that the [petitioner] be evaluated.
>
> The Court: Okay. As I said earlier I don't find a bonified [sic] doubt exists as to the [petitioner's] fitness. These are based on my observations, the [petitioner's] own statements in open court earlier today, as well as the statement by defense counsel who is really in a good position to determine whether or not there is a doubt with regard to the [petitioner's] fitness. So, the prior finding in that regard, will stand.

On direct appeal, Petitioner argued that his failure to take his medications created a bona fide doubt of his fitness and, upon learning that fact, the trial court should have ordered a fitness evaluation. The Court rejected the claim.

> A trial court's decision as to a defendant's fitness to stand trial may be disturbed for an abuse of discretion. In Illinois, a defendant is presumed fit to stand trial, to plead and to be sentenced. A defendant is unfit if, because of his mental or physical condition, he is unable to

understand the nature and purpose of the proceedings against him or to assist in his defense. A trial court has a duty to order a fitness hearing whenever there exists a *bona fide* doubt as to the defendant's ability to understand the charges against him and to participate in his defense. Relevant factors that a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial.

\* \* \*

The record reflects the trial court did not abuse its discretion in finding [petitioner] fit to stand trial. A defendant's statement that he has not been taking medication is not necessarily, in and of itself, enough to create a *bona fide* doubt as to his fitness to stand trial. In [*People v.*] *Hall*, [541 N.E.2d 1369, 1375,] 186 Ill.App.3d 123, 133 (1989), the trial court did not abuse its discretion in relying on its own observations to find no *bona fide* doubt as to the defendant's fitness to stand trial even after being told that the defendant had stopped taking his medication. *Hall*, [541 N.E.2d at 1374-75,] 186 Ill.App.3d at 132-33. The facts here are similar. The court's finding that no *bona fide* doubt existed as to [petitioner's] fitness was properly based on the court's actual observations of [petitioner] while taking into account the totality of the circumstances including the statements of [petitioner] and defense counsel. Accordingly, there was no abuse of discretion and the trial court did not err in failing to *sua sponte* order a fitness evaluation.

A criminal defendant has a substantive due process right not to be tried while unfit. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Under Illinois law, a defendant is presumed fit to stand trial or to plead guilty, and the defendant is unfit "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104–10. This is the standard across

the nation. See *Dusky v. United States*, 362 U.S. 402, 402 (1960) and *Drope v. Missouri*, 420 U.S. 162, 172-73 (1975)). Fitness must be determined in a fitness hearing if evidence before the court creates a bona fide doubt (a substantial reason) to doubt fitness to assist counsel or understand the charges. A defendant must establish this doubt and then must demonstrate at a competency hearing that he is not fit to stand trial. *Medina v. California*, 505 U.S. 437, 451 (1992). If the defendant "has demonstrated that he is more likely than not incompetent," the prosecution may not try him. *Cooper v. Oklahoma*, 517 U.S. 348, 355 (1996).

This case is odd because Essex (who prefers to challenge procedure rather than substance) does not claim he was unfit to stand trial. *See generally United States ex rel. Mireles v. Greer*, 736 F.2d 1160, 1165 (7th Cir. 1984) (distinguishing between "procedural" and "substantive" competency claims). Essex' unfitness claim presents a question of fact. The issue was whether the cessation of medication that, according to experts, would ensure fitness did itself raise a bona fide doubt of fitness. No other serious ground for doubt was raised. What Judge Kazmierski saw and heard was Essex during trial. He was there and other judges were not and the Appellate Court found he took into account the totality of circumstances.

The state court's finding on the bona fide doubt question here qualifies as a "determination of factual issue" that is "presumed to be correct" on federal habeas review, 28 U.S.C. § 2254(e) (1). *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam) (state court's finding of insufficient doubt as to fitness is factual determination); *Rever v. Acevedo*, 590 F.3d 533, 537 (7th Cir. 2010) (same). Petitioner can overcome that presumption of correctness only with "clear and convincing evidence." *Mahaffey v. Ramos*, 588F.3d 1142, 1146 (7th Cir. 2009) (quoting § 2254(e) (1)).

There is no clear and convincing evidence that Judge Kazmierski's finding of no bona fide doubt was in error. All that Essex presents is the fact that he stopped taking the prescribed drugs, a fact which the trial judge acknowledged and weighed in his decision process. Essex offers nothing here to support his claim that the absence of the medication shortly before trial unhinged him from reality. His own inexpert claim that stopping the drugs alone provides bona fide doubt is neither clear nor convincing.

What the trial judge observed was a defendant who "appeared to have . . . a very good grasp of what was going on. . ." and had volunteered "his evaluation or analysis of the testimony that occurred yesterday and ask[ed]

questions with regard to why certain people may or may not have been asked questions by his attorneys . . . ." These findings were made at a time when the judge assumed the truth of the assertion that Essex had stopped taking the medication. After trial, Essex was not shy about complaining in open court which led to the trial judge's noting that he "had a chance to observe [Essex] who makes again cogent arguments about points he believes are important toward his case. That and my other observations of him through the trial, through the post[-]evidentiary phases of the trial, during jury deliberations again leads me to the conclusion today that [there] does not exist a bona fide doubt with regard to [his] fitness."

Essex' trial attorney had informed the court that Petitioner both understood the proceedings and was eager to assist in his defense, explaining that Petitioner "has been able to communicate . . . ask questions, [and] relate information . . ." When requesting a fitness hearing based on fact that Essex was no longer taking medication, conceded that there was no "additional information" indicating unfitness for trial.[3]

---

3 There are many instances of Essex' coherent and relevant comments on the proceedings demonstrating his understanding of the issues in his case. *See, e.g.*, Exh. O at T4-8 (July 17, 2003)(petitioner, complaining about counsel's representation, especially his handling of DNA evidence, and causing counsel to withdraw); *id.* at U3 (August 28, 2003) (petitioner, in response to question from court, informing court that it had not yet held a fitness hearing); *id.* at W3 (November 4, 2003) (petitioner, complaining that court did not assign him attorney who specializes in death penalty cases); *id.* At DD3 (April 6, 2004) (petitioner demanding speedy trial and, in addressing evidence of other crimes, complaining that he did not have an aggravated

In short, Essex cannot make the case that the finding of no bona fide doubt was contrary to clearly established federal law or was an unreasonable application of such law or was based on an unreasonable determination of the facts. Judge Kazmierski's finding was based on a permissible opinion. See *Woods v. McBride*, 430 F.3d 813, 816-20, 822 (7th Cir. 2005) (re-litigation of claim barred under § 2254(d) unless state court decision fell "well outside the boundaries of permissible differences of opinion").

Essex has filed a lengthy Reply to the Answer filed by the Warden. It offers no valid legal arguments but a careful examination suggests the reasons why so few of his claims were properly preserved and why he has done so little to support the claims even if they were preserved.

Essex' main objections are based on his own conception of what procedures need to be followed before a court can reach a decision. He does not bother to show that a different procedure would lead to a different result.

---

battery conviction on his record); *id.* at JJ4 (October 12, 2004) (trial counsel, explaining that petitioner had recently demanded speedy trial); Exh. P at LL13-14 (January 3, 2005) (petitioner, agreeing to counsel's stipulation to certain proof); *id.* at LL15 (January3, 2005) (petitioner, agreeing that he understood logistics of jury selection); Exh. Q at NN3-4 (January 5, 2005) (petitioner, complaining that counsel did not cross examine Jennifer Kakooza and failed to locate witness); *id.* at PP3-4 (February 3,2005) (petitioner, complaining that counsel failed to locate proposed alibi witness; explaining that an acquaintance had located alibi witness through NEXIS/LEXIS database; and alleging that Kakooza committed perjury when she said she was the victim's aunt); *id.* at PP12-13 (petitioner, complaining that his acts of prior violence should not be considered in aggravation at sentencing); Exh. R at C44 (November 21, 2003) (pro se petition for transcripts of proceedings for eight dates).

He rarely attacks the result (which is the very thing that puts him in prison). He attacks his counsel's failure to object without any showing that the objection would be successful. It is the objection itself that matters to him. Perhaps he assumes the objection will be sustained, but he seldom justifies this assumption by showing that evidence was wrongly admitted. He is dissatisfied with the process at every single stage of the proceedings but seldom, if ever, tries to show that the result would have been different. He emphasizes his claim about the failure of defense counsel to call an "alibi" witness whose location was "known" to the defender, yet he never recites what that alibi might be, nor does he attempt to prove that there was an alibi which, in effective post-conviction cases, is usually accomplished by filing an affidavit from a witness who states what his or her testimony might be. We have only Essex' opinion that there is an unspecified "alibi" that would have been offered by a named person.

In his Reply, he reacts to the Answer by shifting his position to new theories of why he should win his case. He alters his grounds for relief and, in doing so, loses sight of the original grounds he offered. This may well be the reason that he failed to carry through so many of his grounds from the beginning of the post-conviction process to the end. The very large number

of grounds he has raised at some point or other (some for the first time in this court) leaves him with an unfocused attack with various grounds falling to the wayside and others inserted in their place or recast under different legal theories. He is a critic of the judge's procedural performance and, in so acting, loses sight of the proper goal of showing that his case on review reached the wrong result.

There is a passage in his Reply that suggests the reason he looks so closely at procedure. I quote it in full.

> Petitioner had initially commended and praised the works of his direct appeal attorney, Gilbert Lenz, as the only advocate who put up a fight for petitioner. Lenz responded by thanking petitioner for "the kind words." Lenz voluntarily filed a petition rehearing in the Illinois Appellate Court, and he filed a PLA in the Illinois Supreme Court even though he had no legal obligation to do so. However, Filpi's October 2009 revelation, as described earlier, showed Lenz up as a participant in the fraudulent scheme, just as Nance, Davis and Filpi had colluded with the State. The state judges did their part to subvert the true purposes of the courts, which is primarily to deal with each case or controversy with truth and justice.
>
> The first order of business of any lawyer involved with a case is to absorb the matter of the litigation, the indictment. Lenz specifically stated in the opening brief on direct appeal that 'No issue is raised challenging the charging instrument.' As related earlier, petitioner and his family had no success in obtaining the public records of the grand jury. But, Filpi's 2009 deceitful act unintentionally brought the truth out. Some papers had been forged! Petitioner had never been charged, and that was the reason why his family could not obtain the records; and

that was the reason why Nance, Davis, Lenz and Filpi[4] joined
the judges and prosecutors and other in the fraudulent
concealment of that fact.

Essex displays personal certainty that he was betrayed by four of his

own lawyers who acted in a conspiracy against him along with the judges

and prosecutors. Personal certainty is not evidence.

What Essex has presented in his many pages of briefing and pleading

does not come close to a justification for issuance of the writ or, for that

matter, any further hearings.

---

4 Nance, Davis, Lenz and Filpi all served as Essex' counsel at various stages of trial and appeal.

I am required by rule to consider whether to certify any of the claims for appeal. To obtain a certificate of appealability, Petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

That showing is not made here. The only claim, neither waived nor forfeited, depends upon overturning a state judge's finding of fact which finding is clearly within the realm of reasonable judgment and not worthy of relitigation.

I deny the petition for a writ of habeas corpus and I decline to issue a certificate of appealability.

ENTER:

JAMES B. ZAGEL
U.S. District Judge

September 14, 2012